IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

RAY TURNER a/k/a AUTHOR X a/k/a
AUTHOR R. TURNER,

    Plaintiff,

v.                                                           No. 1:15-cv-01135-JDB-cgc

DERRICK SCHOFIELD, *et al.,*

    Defendants.

---

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

BACKGROUND AND PROCEDURAL HISTORY

At all times relevant to this action, the Plaintiff, Ray Turner a/k/a Author X a/k/a Author R. Turner, an adherent of the Nation of Islam and the teachings of The Most Honorable Elijah Muhammad, The Messenger of ALLAH and The Honorable Minister Louis Farrakhan, was incarcerated at Northwest Correctional Complex in Tiptonville, Tennessee ("NWCX"). Turner, who has since been transferred and is currently housed at the Turney Center Industrial Complex in Only, Tennessee, filed a *pro se* complaint on June 2, 2015, against the Tennessee Department of Correction ("TDOC"), Derrick Schofield, Tony Parker, William Gupton, Jane Amonett, TDOC cook "Chill," Mike Parris, Mark Watson, Veronica Cadney, Susan Redden, Rick Duncan, Mike Lavender, Kurt Gross, Bradley Canada, and Recie Yanders, pursuant to 42 U.S.C. § 1983. (Docket Entry ("D.E.") 1.)

In a screening order entered July 20, 2016, United States District Judge James D. Todd[1] found that the complaint alleged claims for violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA"), and the First Amendment's Free Exercise Clause. (D.E. 11.) Judge Todd (1) denied as moot Plaintiff's claims for declaratory and injunctive relief; (2) denied claims against the individual Defendants in their official capacities[2]; (3) dismissed all claims against TDOC, Cook Chill, Schofield, Watson, Parker, Gupton, Canada, and Yanders; (4) dismissed all claims alleged on behalf of similarly-situated inmates, claims for retaliation, and claims concerning segregated inmates; and (5) denied Turner's request for a temporary restraining order. The Court directed that service be issued as to Amonett, Cadney, Redden, Duncan, Parris, Gross, and Lavender.

On October 13, 2016, these Defendants moved for dismissal of those claims that survived screening pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.[3] (D.E. 37.) The Court, in an order entered September 25, 2017, dismissed the RLUIPA claims against all Defendants as well as Plaintiff's claims against Amonett. (D.E. 57.)

Pending on the docket is the February 12, 2018, motion of the remaining Defendants, Cadney, Duncan, Gross, Lavender, and Redden (sometimes collectively referred to herein as the "Movants"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

---

[1]On February 28, 2018, this matter was reassigned to the undersigned pursuant to Administrative Order 2018-09. (D.E. 64.)

[2]In the instant motion, it is argued that Turner's claims for declaratory and injunctive relief and for an award of damages against the Defendants in their official capacities should be dismissed. Since it appears those claims were dismissed in the July 20, 2016, order, the Court will not address them again here.

[3]The motion to dismiss was filed on behalf of Defendants Parris, Amonett, Redden, Cadney, Duncan, and Gross. Lavender joined in the motion on June 15, 2017, after he was served with process. (D.E. 56.)

2

(D.E. 62.) The motion seeks judgment as to the claims still before the Court, identified in the September 25, 2017, order as the Movants' alleged failure, in violation of the First Amendment, to accommodate Plaintiff's specific religious diet restrictions and to permit him to use only his religious name when signing up for religious programs. Turner filed a response to the motion on June 14, 2018.[4] (D.E. 76.) For the reasons articulated herein, the motion is GRANTED.

STANDARD OF REVIEW

Rule 56 requires the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Fed. R. Civ. P. 56(a). "There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmovant." *Rees v. W.M. Barr & Co., Inc.*, ___ F. App'x ___, 2018 WL 2473003, at *3 (6th Cir. June 4, 2018) (quoting *Burgess v.*

---

[4]Turner titled his filing "Plaintiff's Motion in Opposition to Defendant[s'] Motion to Dismiss Pursuant to Rule 56." (D.E. 76 at PageID 999.) It is, however, and will be construed as, his response to the Movants' motion for summary judgment.

The response is untimely. The local rules of this district provide that a response to a motion for summary judgment must be filed within twenty-eight days after service of the motion. LR 56.1(b). On March 1, 2018, Turner moved for a thirty-day extension of the response deadline (D.E. 65), which was granted on March 5, 2018 (D.E. 66). As the response was not actually due until March 15, 2018, the Court granted the thirty-day extension to run from that date. He filed a motion for a second thirty-day extension on April 12, 2018, citing nearly the same reasons relied upon in seeking his first extension. (D.E. 70.) The Court granted this motion in an order entered April 13, 2018, setting the deadline at May 15, 2018. (D.E. 71.) Plaintiff was cautioned, however, that the Court would not grant a third extension. Despite the Court's admonition, a third motion for a thirty-day extension was filed on May 17, 2018 (D.E. 72), which was denied on May 29, 2018 (D.E. 74). Even though the response was filed out of time, however, the Court will consider the assertions contained therein as limited by the ruling set forth at pages 5 and 6 of this opinion.

[5]In reviewing his memorandum, it appears to the Court there may be some confusion on Plaintiff's part concerning the appropriate standard of review to be applied to the instant motion. He cites to Fed. R. Civ. P. 12(b)(6), which governs motions to dismiss for failure to state a claim, and caselaw relating to such motions. However, the Movants request not a Rule 12(b)(6) dismissal but summary judgment pursuant to Rule 56. Thus, cases describing the parameters of a Rule 12(b)(6) analysis have no relevance.

*Fischer*, 735 F.3d 462, 471 (6th Cir. 2013)) (internal quotation marks omitted). "The moving party bears the initial burden of establishing that there are no genuine issues of material facts, which it may accomplish by demonstrating that the nonmoving party lacks evidence to support an essential element of [his] case." *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 851 (6th Cir. 2017) (internal quotation marks omitted). "The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party." *Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017) (per curiam). "[C]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment." *Id.* Thus, "in order to defeat summary judgment, the party opposing the motion must present affirmative evidence to support [his] position; a mere scintilla of evidence is insufficient." *Id.* (internal quotation marks omitted). In making a determination on a Rule 56 motion, the court is to "view the evidence in the light most favorable to the nonmoving party." *Lossia v. Flagstar Bancorp, Inc.*, ___ F.3d ___, 2018 WL 3321187, at *3 (6th Cir. July 6, 2018).

While Turner is a *pro se* litigant, and the Court has "a corresponding duty to accord him the benefit of a liberal construction of his pleadings and filings, *pro se* plaintiffs are not automatically entitled to take every case to trial and the lenient treatment generally accorded to *pro se* litigants has limits." *Farah v. Wellington*, 295 F. App'x 743, 748 (6th Cir. 2008) (internal alterations, citations and quotation marks omitted). Such liberal treatment of *pro se* pleadings "does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006). Moreover, "[i]t is the affirmative obligation of the trial judge to prevent factually unsupported claims . . . from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted).

4

PRELIMINARY MATTERS

The Court deems it necessary to discuss certain matters prior to addressing the merits of the parties' arguments. First, the Court must reproach both the Plaintiff and counsel for the Movants for their failure to follow the local rules with respect to the length of their briefs. LR 56.1, which governs motions for summary judgment, limits separate statements of material facts to ten pages and responsive memoranda to twenty pages absent prior Court approval. LR 56.1(a)-(b). The parties' filings ran thirty-five and forty-eight pages, respectively, with no approval to exceed the limitation sought or received by either side. The parties are advised that disregard for the local rules is frowned upon and risks entry of orders striking oversized briefs from the docket.

Second, Turner has failed to respond to the Movants' statement of facts in accordance with LR 56.1 and Fed. R. Civ. P. 56. The federal rule permits the Court, upon a party's failure "to properly address another party's assertion of fact . . . [to] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(3).

> LR 56.1 requires that
>
> [a]ny party opposing the motion for summary judgment must respond to each fact set forth by the movant [in the statement of undisputed material facts] by either: (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed.
>
> Each disputed fact must be supported by specific citation to the record. Such response shall be filed with any memorandum in response to the motion. The response must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant. In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant. In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are

material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

LR 56.1(b). "Failure to respond to a moving party's statement of material facts . . . within the time periods provided by [the local rules] shall indicate that the asserted facts are not disputed for purposes of summary judgment." LR 56.1(d). Based on Plaintiff's failure to respond to the Movants' statement of material facts, those facts are adopted by the Court to the extent they are properly supported by the record evidence. *See Nolen v. FedEx TechConnect, Inc.*, 971 F. Supp. 2d 694, 700 (W.D. Tenn. 2013) (requirements of Rule 56(e) and LR 56.1 applied to *pro se* nonmovant), *aff'd* (6th Cir. 2014).

Finally, the Court notes that Plaintiff's response to the motion for summary judgment contains allegations of violations of the Ninth Amendment, the Fourteenth Amendment's Equal Protection Clause, and the Tennessee constitution. However, the Court's screening order did not recognize such claims; nor has Turner subsequently sought to amend his complaint to properly allege those claims. As a response to a motion for summary judgment is not a proper vehicle for placing new claims before the Court, *see Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788-89 (6th Cir. 2005), these allegations will not be considered.

ARGUMENTS OF THE MOVANTS AND ANALYSIS

*Section 1983 Claims Generally*

Section 1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

To state a claim under the statute, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Doe v. Miami Univ.*, 882 F.3d 579, 595 (6th Cir. 2018). "Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013) (internal quotation marks omitted). The Movants maintain, and the Court agrees, that no constitutional violation occurred.

*First Amendment Claims Against Gross and Lavender for Failure to Issue Passes to Attend Religious Services*

Plaintiff alleges in his complaint that, in August 2014, Gross and Lavender[6] (the "Chaplain Defendants") issued a sign-up sheet for passes, necessary to attend religious classes or services, that required inmates to write down their legal names as listed in the Tennessee Offender Management Information System ("TOMIS"), that is, their "committed"[7] names, rather than adopted religious names such as those containing an "X." According to the affidavit of NWCX Warden Mike Parris, TOMIS is TDOC's official recordkeeping system and "tracks all aspects of the inmate's movement, health, security, visitation[,] and other information using the inmate's committed name." (Aff. of Warden Mike Parris ("Parris Aff.") ¶ 5, D.E. 62-3, at PageID 907.) He stated further that "[b]oth TDOC and NWCX policies require that inmates use their committed name on official correspondence, programming sign-up sheets, medical records[,] and other documents, even if they also list an alias or 'a.k.a.' such as a legal name acquired after their incarceration." (*Id.* ¶ 6, D.E. 62-3, at PageID 907.) The warden explained

---

[6]According to the complaint, Lavender is no longer employed by NWCX.

[7]The term "committed" refers to the legal name under which the inmate was convicted and sentenced. *See, e.g., Mutawakkil v. Huibregtse,* 735 F.3d 524, 526 (7th Cir. 2013); *Gilbert v. Fox*, Civil Action No. 16-cv-00354-GPG, 2016 WL 931287, at *2-4 (D. Colo. Mar. 11, 2016), *appeal dismissed* (10th Cir. June 1, 2016).

that

> [t]his requirement is a security measure which is essential to the management of any prison. . . . In the event of an escape, riot[,] or a count which results in a missing inmate, it is imperative that the inmate be identified immediately. This requires the use of committed names on all official documents, including sign-up sheets for religious programming, educational programming[,] and work assignments, among other instances.

(*Id.* ¶¶ 7-8, D.E. 62-3, at PageID 907-08.)

In his affidavit, Gross stated that his responsibilities as chaplain included processing inmates' religious requests, signing them up for religious programs, and maintaining precise records of those who attend services in the prison chapel. (Aff. of Chaplain Kurt Gross ("Gross Aff.") ¶ 4, D.E. 62-4, at PageID 910.) Prior to TDOC's adoption of a more restricted tier management system in March 2014, access to religious services was granted through a general call-out method. (*Id.* ¶¶ 6-7, D.E. 62-4, at PageID 911; Parris Aff. ¶ 11, D.E. 62-3, at PageID 908.) All interested inmates would report to the chapel for services at the designated time. (Gross Aff. ¶ 7, D.E. 62-4, at PageID 911.)

Under the new paradigm, "each inmate who wants to attend a religious service must place his name on the official sign-up sheet, evidencing his whereabouts. Passes are typically generated the day prior to the service or program at issue." (*Id.*) Attached as an exhibit to the complaint is a sign-up form for chapel at the bottom of which reads: "ONLY <u>FULL legal NAMES PRINTED CLEARLY as listed in TOMIS</u> will be issued passes (aka's, code names, 'x' names, or initials will NOT receive passes)." (D.E. 2-10 at PageID 325.)

According to Gross, Turner provided no documentation to the prison indicating a legal name change. (Gross Aff. ¶ 11, D.E. 62-4, at PageID 912.) The chaplain stated that, when Plaintiff signed up for services using his committed name, he was issued a pass. (*Id.* ¶ 13, D.E. 62-4, at PageID 912.) Although there were occasions when Turner refused to sign up with his

8

committed name, Gross could not recall him being denied access to religious services based solely on that refusal because his counsellor or some other officer would issue a handwritten pass, which ultimately had the same effect as the computer-generated document. (*Id.* ¶¶ 15-17, D.E. 62-4, at PageID 912-13.)

Plaintiff asserts that, by failing to issue passes allowing him to attend religious services because he used his Muslim name, Author X, rather than his committed name, Author Turner, to sign up for such passes, the Chaplain Defendants violated his rights under the First Amendment. "Because the difficulties of operating a prison must not be underestimated by the courts, . . . a prisoner's constitutional claims [are reviewed] under a standard that affords deference to the judgments of correctional officers, who must have substantial discretion to devise reasonable solutions to the problems they face." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 571 (6th Cir. 2013) (internal citation and quotation marks omitted). The First Amendment, by virtue of the Fourteenth Amendment, forbids a state's prohibition on the free exercise of religion. *Hayes v. Tenn.*, 424 F. App'x 546, 549 (6th Cir. 2011) (citing U.S. Const. amend. I). While "[p]risoners retain the First Amendment right to the free exercise of their religion, . . . the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs, requiring a court to balance the prisoners' constitutionally protected interest in the free exercise of their religious beliefs against the state's legitimate interests in operating its prisons." *Id.* (internal citation and quotation marks omitted). Generally, "[p]rison officials may impinge on [an inmate's] constitutional rights only if the regulation [at issue] is reasonably related to legitimate penological interests." *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)) (internal quotation marks omitted).

However, courts in this Circuit have long held that a corrections official's failure or

refusal to recognize an inmate's adopted religious name falls short of a constitutional violation. *See Imam Ali Abdullah Akbar v. Canney*, 634 F.2d 339, 340 (6th Cir. 1980) (per curiam) (because such matters are best characterized as involving internal prison administration, the court did not believe that any inmate, in that case a prisoner who had changed his name upon acceptance of the Muslim religion during his incarceration, "has a constitutional right to dictate how prison officials keep their prison records"); *see also Spies v. Voinovich*, 173 F.3d 398, 406 (6th Cir. 1999) (finding an inmate's claim that prison officials violated his First Amendment rights by refusing to use his religious name devoid of merit); *Shuaib v. Stiddum*, No. 88-5227, 1988 WL 86126, at *1 (6th Cir. Aug. 18, 1988) ("it is well established that the failure to refer to an inmate by a legally-adopted name simply is not violative of the first amendment right to freedom of religion"); *Al-Amin v. TDOC Comm'r*, No. 3:12-cv-00249, 2012 WL 1231737, at *4-5 (M.D. Tenn. Apr. 11, 2012) ("the Sixth Circuit has repeatedly found no merit to a prisoner's claim that 'prison officials violated his First Amendment rights by refusing to use his religious name'"). This line of reasoning has been found even more compelling where, as here, there is no evidence that the inmate legally changed his name. *See Rahman v. Stephenson*, 626 F. Supp. 886, 887-88 (W.D. Tenn. 1986) (finding *Canney* applied with greater force when inmate did not legally change his name, noting that, "[i]f inmates were allowed to change names at will and to impose each and every name change upon prison officials, these officials would be unable to trace inmate movement through the prison system, protect against fraudulent use of inmate names, or quickly identify inmates who escape or commit crimes within an institution."). Moreover, in this case, the evidence the Court finds to be undisputed reflects that, even when refused a computer-generated pass, Turner could, and did, attend religious services after obtaining a handwritten pass from other prison officials that had the same practical effect as the

computer-generated document.  The Chaplain Defendants' motion for summary judgment on this issue is, therefore, GRANTED.

*First Amendment Claims Against Defendants Cadney, Duncan, and Redden for Failure to Provide Religious Diet*[8]

Plaintiff's assertion that he was not provided an appropriate halal religious diet is directed at Defendants Cadney, Duncan, and Redden (the "Kitchen Defendants"), who worked at the prison as Food Service Manager III, Assistant Food Manager, and Food Steward II, respectively. When incarcerated at NWCX, Turner participated in the halal meal program, noting on the program's request form, dated September 3, 2013, that he did not eat pork.  (D.E. 1-9 at PageID 142; *see also* Pl.'s Aff, D.E. 1-1, ¶ 7, at PageID 72.)  In his affidavit, the Plaintiff stated that he observed NWCX kitchen workers on various occasions serving pork in the religious diet cafeteria line, that they did not change their gloves before handling halal meals, that he was on one occasion served a pork cutlet and on another non-halal chicken, and that he was in a few instances served only vegetables, milk, and bread.  In a letter dated January 9, 2015, addressed to TDOC Commissioner Schofield, Turner complained that the proper halal diet for followers of the Nation of Islam consisted of "fresh vegetables, fruits, pure fresh milk and pure fruits [sic] juice nor [sic] pure whole wheat bread" and halal meats that have been ground in front of [the prisoner] and that are additive-free.  (D.E. 1-17 at PageID 277.)

---

[8]While a prison's failure to provide a religious diet falls under the First Amendment, an inmate's claim that it failed to serve him a special diet that avoided his food allergies invokes the Eighth Amendment.  *See Balcar v. Smith*, No. 17-5159, 2017 WL 3613479, at *2 (6th Cir. July 17, 2017).  In its September 25, 2017, order, the Court allowed the Plaintiff to amend his complaint to "more fully assert such an Eighth Amendment [deliberate indifference to serious medical needs claim regarding the prison kitchen's failure to accommodate his alleged allergies to peas and beans] if he [chose] to do so."  (D.E. 57 at PageID 826.)  He did not.  Accordingly, as it is left to conclude that Plaintiff has elected not to pursue any such claim, the Court will give no further consideration to his arguments concerning food allergies.  The Court notes, however, that there is no medical evidence in the record to support the allegation that Turner suffered from food allergies of any kind.  *See* n.10.

11

According to the Kitchen Defendants' affidavits, kitchen staffers were required to serve meals as indicated on menus provided by the TDOC Central Office in Nashville. These meals complied with federal guidelines for nutritional and caloric content, serving sizes, etc. Religious meals, including halal, were certified based on input from community religious leaders as well as dietary professionals. They also related that Turner frequently complained about and refused food he did not like or want and that he was never, to their knowledge, denied food or a religious diet tray.

Cadney stated in her affidavit that

> [s]erving pork off of the regular line was permissible. We follow a strict protocol which allowed one inmate to serve nothing but pork. He would not touch the trays, he would just place the pork on the tray as it was moved down the line. Therefore, no other trays were contaminated.

(Aff. of Veronica Cadney ("Cadney Aff."), D.E. 62-6, ¶ 11, at PageID 920.) TDOC Policy 116.08(VI)(C), effective September 1, 2014, a copy of which was attached as an exhibit to the complaint, required that surfaces "be cleaned and sanitized appropriately to avoid cross-contamination" and stated that "[t]he Food Service Department [was] not required to purchase or use separate equipment or utensils for the preparation and service of religious meals[.]" (D.E. 2-14 at PageID 386.)

The First Amendment right to free exercise of religion also includes a prisoner's right to an adequate diet that does not violate his religious dietary restrictions. *Welch v. Spaulding*, 627 F. App'x 479, 482 (6th Cir. 2015) (citing *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010)), *cert. denied*, 137 S. Ct. 31 (2016). "For the inmate, this is essentially a constitutional right not to eat the offending food item." *Alexander v. Carrick*, 31 F. App'x 176, 179 (6th Cir. 2002) (per curiam). "If the prisoner's diet is sufficient to sustain the prisoner in good health, no

constitutional right has been violated." *Colvin*, 605 F.3d at 290 (quoting *Alexander*, 31 F. App'x at 179) (internal alterations omitted).

The isolated incidents in which Plaintiff was served a pork cutlet or non-halal chicken do not rise to the level of a constitutional claim. *See id.* at 293 (prison officials' random, isolated service of nonkosher food to prisoner not sufficient to sustain a First Amendment claim). Nor is there any evidence to indicate that these incidents were intentional. *See id.* at 293-94 (given "the lack of any evidence indicating deliberate violations of [the prison's] kosher-meal program, [defendants were] entitled to summary judgment" on inmate plaintiff's First Amendment claim); *see also Green v. Caruso*, No. 1:10-cv-958, 2011 WL 1113392, at *6 (W.D. Mich. Mar. 24, 2011) (where Muslim inmate plaintiff alleged "only that isolated acts of negligence by prison food-line staff resulted in his food being contaminated with pork," he failed to state a claim, as "[i]t is well established that negligent conduct will not state a constitutional claim under § 1983.").

His claim of cross-contamination due to inmate workers' failure to change gloves between handling pork trays and halal trays fails as well. In his affidavit, the Plaintiff averred that he watched the food steward hand out at least ten pork trays before touching halal food trays, without changing her gloves. (*See* Pl's Aff. ¶ 17. D.E. 1-1, at PageID 73.) It appears from the affidavit that this took place during a single incident. Much later in the affidavit, Turner stated that "[t]hese inmates are not changing their gloves on their hands and are making the [h]alal religious trays!" (*Id.* ¶ 71, D.E. 1-1, at PageID 80.) It is unclear whether ¶ 71's conclusory statement was based on personal observation or hearsay or whether it referred to the incident described in ¶ 17 or a different one. The record contains no other information relative to this allegation. As noted in the previous paragraph, isolated incidents of negligence are not

13

actionable. The vague statement made in ¶ 71 is simply insufficient to support a denial of summary judgment. *See Bey v. Tenn. Dep't of Corr.*, No. 2:15-CV-174-TWP-MCLC, 2018 WL 1542383, at *6 n.8 (E.D. Tenn. Mar. 29, 2018) ("Plaintiff does not aver as to whether he personally witnessed cross-contamination, or whether this statement is based on hearsay. Because no other evidence in the record supports his averment, the Court finds it insufficiently reliable, as it is not clear that it is based on Plaintiff's personal knowledge, and as such, the Court will not rely on it on summary judgment.").

Turner's claim of cross-contamination due to religious meals being served on the same line as regular meals fares no better. Plaintiff has offered no proof to rebut Cadney's affidavit.[9] Nor is there any evidence in the record that cross-contamination ever actually occurred, intentionally or otherwise. Rather, the inmate merely speculates that it occurred as a result of what he considered weakness in prevention. "Such hypothetical speculation is insufficient to forestall summary judgment . . ., where the moving party has met its own burdens through unrebutted testimony . . ." *Greene v. Cabral*, ___ F. Supp. 3d ___, 2018 WL 3014826, at *10-11 (D. Mass. June 15, 2018); *see also Bey*, 2018 WL 1542383, at *6 n.8 (where plaintiff's allegation of cross-contamination was not based on his personal witnessing of such contamination and there was no other record evidence to support the claim, it was insufficiently reliable for the court to consider it at the summary judgment stage). On this record, the Court finds that Turner's conclusory and speculative assertion that halal meals were at times served in the same cafeteria diet line as regular meals and, therefore, must have been contaminated, is insufficient to survive summary judgment.

---

[9]Turner does not appear to be attacking the TDOC policy concerning kitchen procedures.

Summary judgment is also appropriate with respect to Turner's assertions that the nature of the halal diet itself and the quality thereof violated his constitutional rights. As the district court in *Bey* explained,

> [t]here does not appear to be universal agreement as to what constitutes a halal diet in the prison context. However, regardless of the lack of consensus as to the definition of [h]alal, courts have determined that a correctional facility need only provide Muslim prisoners with food that is not haram. As such, courts have consistently concluded that there is no right to [h]alal meat entrees, rather than vegetarian meals and non-meat substitutes under the Constitution . . .
>
> Stated another way, inmates['] food preferences, as prisoners, are limited. After all, the Constitution does not mandate comfortable prisons. As such, there is no constitutional right to tasty or widely varied foods, nor is there a constitutional right for each prisoner to be served the specific foods he desires in prison.

*Bey*, 2018 WL 1542383, at *6-7 (internal alterations, citations, footnotes, and quotation marks omitted).

Plaintiff does not specifically argue in his response to the dispositive motion, nor does he aver in his affidavit, that any foods served as part of the halal diet were "haram."[10] Nor does he assert that the diet was insufficient to sustain him in good health. Finally, he was not entitled under the First Amendment to halal meat entrees instead of vegetarian meals.

---

[10] Attached to a January 9, 2015, letter from Plaintiff to Warden Parris, a copy of which is appended as an exhibit to the complaint, is what appears to be an excerpt from a book containing the teachings of The Most Honorable Elijah Muhammad on how to eat. Listed are "FOOD WE DO NOT EAT!!," which includes pork and various types of marine animals, as well as beans and peas. (D.E. 2 at PageID 280-83.) There is no indication in the record that any of the nonpork meats enumerated on the list were served in the NWCX cafeteria. To the extent the beans and peas listed are, like pork, "haram," pursuant to the statements made by the Kitchen Defendants in their affidavits as referred to herein, which the Court finds to be undisputed, Plaintiff had substitutions available to him for those foods, including turnip greens, carrots, corn, and spinach. (*See* Aff. of Rickie Duncan ¶¶ 11-12, D.E. 62-7, at PageID 923; Cadney Aff. ¶¶ 7-8, D.E. 62-6, at PageID 920; Aff. of Susan Redden ¶ 9, D.E. 62-5, at PageID 917.) The Court will not speculate as to whether the listing of beans and peas formed the actual basis for Turner's "allergy" claims.

## CONCLUSION

Based on the Court's grant of summary judgment in favor of the Movants, this matter is DISMISSED in its entirety.[11]

IT IS SO ORDERED this 16th day of July 2018.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[11]In light of the Court's determination that no constitutional violation took place, it need not address the Movants' remaining assertions.